**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

EUGENIV FLORIAN CIUCA, et al.,

Defendants.

Case No. 2:18-cr-00001-MMD-CWH

**REPORT AND RECOMMENDATION**
(ECF Nos. 95, 96)

Before the court is defendant Eugeniv Ciuca's Motion to Suppress Evidence (ECF No. 95), filed May 24, 2018, the government's response (ECF No. 115), filed May 31, 2018, and Serban's reply (ECF No. 123), filed June 7, 2018. Co-defendant Oana Serban moved for joinder to the Motion (ECF No. 101), which was granted (ECF No. 117), on June 1, 2018.

Also before the court is defendant Ciuca's Motion to Suppress Statements (ECF No. 96), filed May 24, 2018, and the government's response (ECF No. 104), filed May 26, 2018. The court conducted an evidentiary hearing on August 9, 2018. (Mins. of Proceedings (ECF No. 157).)

Ciuca then moved to supplement his motion to suppress (ECF No. 163), on September 5, 2018, which the court granted. (ECF No. 165). Ciuca then filed the supplement (ECF No. 168) on September 11, 2018. Co-defendant Serban moved to join the supplement (ECF No. 170) on September 13, 2018. The government responded (ECF No. 174) on September 19, 2018. Ciuca file a reply (ECF No. 177) in support of the supplement on September 26, 2018. Serban filed a reply (ECF No. 178) in support of her joinder on September 26, 2018.

## I.    BACKGROUND

The government claims that in September 2017, defendants Ionut Bitere (Bitere), Eugeniv-Florian Ciuca (Ciuca), and Oana Maria Serban (Serban) traveled from Romania to the United States to commit ATM skimming and fraudulent cash withdrawals. According to the

1   government, they started their ATM skimming activities in Illinois and moved their way across

2   the United States, arriving in Las Vegas, Nevada in November 2017.  They conducted a spree of

3   ATM skimming and cashouts that targeted area credit unions, but on December 5, 2017, all three

4   were arrested.

5          On January 3, 2018, a grand jury in the District of Nevada indicted defendants with the

6   following crimes: Count 1 – Conspiracy to Commit Fraud and Related Activity in Connection

7   with Access Devices (18 U.S.C. § 1029(b)(2)); Count 2 – Possession of Access Device-Making

8   Equipment (18 U.S.C. § 1029(a)(4)); Count 3 – Possession of Fifteen or More Counterfeit or

9   Unauthorized Access Devices (18 U.S.C. § 1029(a)(3)); Count 4 – Use or Trafficking of an

10   Unauthorized Access Device (18 U.S.C. § 1029(a)(2)); and Counts 5-9 – Aggravated Identity

11   Theft (18 U.S.C. § 1028A).  On April 25, 2018, the grand jury returned a superseding indictment

12   that added a Count 10 – Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(a)(2)(A)

13   and (h)).

14                                   II.    **DISCUSSION**

15          Disputing none of the facts contained in the affidavit supporting the search warrant, Ciuca

16   and Serban argue that probable cause did not exist to justify the state judge's authorized search

17   warrant.  They also argue that the government conducted a search of their hotel room prior to

18   obtaining a search warrant, and therefore violated their Fourth Amendment rights against

19   unreasonable search and seizure.  Ciuca further argues that agents elicited incriminatory

20   statements while he was in custody, but prior to providing *Miranda* warnings, and therefore

21   moves to suppress that statement as violative of his Fifth Amendment rights against self

22   incrimination.  The government responds that there was probable cause to issue the warrant, there

23   was no search of Ciuca's room prior to the issuance of the warrant, and the statement made by

24   Ciuca was volunteered, and not the result of interrogation.

25          A.     **The sufficiency of the search warrant**

26          On December 5, 2017 at 2:13 p.m. (PST), Las Vegas Metropolitan Police Department

27   Detective M. Jogodka ("Detective Jogodka") submitted an application for a telephonic warrant to

28

1    search Excalibur Hotel Suite 16-240, located at 3850 S. Las Vegas Boulevard, Las Vegas,

2    Nevada 89109.  The warrant was issued by Nevada state court Judge Diana Sullivan at 2:30 p.m.

3    Ciuca and Serban argue that the search warrant lacked probable cause to believe a crime had been

4    committed or that evidence of a crime would be found in his hotel room.  Specifically, Ciuca

5    argues that the fact that he had a forged passport and that Bitere used a vehicle registered under

6    that forged passport name are insufficient to establish probable cause to believe that Ciuca

7    committed bank fraud, or that the evidence would be found in his room.  He says there is

8    insufficient connection between Bitere and himself to justify the warrant.

9        The Fourth Amendment addresses "the right of the people to be secure in their persons,

10    houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV.

11    The Fourth Amendment protects reasonable and legitimate expectations of privacy.  *Katz v.*

12    *United States*, 389 U.S. 347 (1967).  It protects "people not places."  *Id.*  Evidence obtained in

13    violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit

14    of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

15        As a general rule, a search warrant may only issue upon a showing to a neutral magistrate

16    that probable cause exists to support the proposed search.  The Supreme Court has described

17    "probable cause" as a "fair probability that contraband or evidence of a crime will be found in a

18    particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The magistrate must be provided

19    with sufficient facts from which he may draw the inferences and form the conclusions necessary

20    to a determination of probable cause.  *Giordenello v. United States*, 357 U.S. 480, 485-86 (1958).

21    Probable cause is to be determined on the basis of the "totality-of-the-circumstances."  *Gates*, 462

22    U.S. at 230.  A magistrate judge's determination of probable cause is accorded significant

23    deference.  *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995).  The issuance of a search

24    warrant is upheld "if the issuing judge 'had a substantial bases' for concluding [that] probable

25    cause existed based on the totality of the circumstances."  *Ewing v.  City of Stockton*, 588 F.3d

26    1218, 1223 (9th Cir. 2009).

27        The court finds that the affidavit contains sufficient facts to establish probable cause.  The

28    affidavit detailed extensive facts showing that the occupant of a burgundy Saturn registered in the

name of "Mavromatis Fotis" was responsible for placing a skimming device and was used by an individual, later determined to be Bitere, to conduct fraudulent ATM cashouts. The Saturn was registered to "Mavromatis Fotis" and its license plate was installed upside down when the car was used to conduct the ATM cashouts. Investigators located a room registration at the Budget Suites, which indicated that a room had been rented by "Mavromatis Fotis" using a fraudulent Greek passport. Through assistance of customs and immigration officials, the detective learned that the true identity of "Mavromatis Fotis" was Ciuca, a Romanian national. The registration also listed the other occupant of the Budget Suites room as "Oana Serban" and contained a copy of her passport (along with Ciuca's fake passport). The detective stated that the practice of fraud suspects using fictitious documents to hide their identity lead him to believe that Ciuca and Serban, both Romanian nationals, were involved with the fraudulent withdrawals at OneNevada Bank using the Saturn.

The detective then learned that, on December 5, 2017, Bitere had committed additional cashouts using Ciuca's burgundy Saturn. With the assistance of Excalibur security, the detective was able to identify Ciuca's Saturn returning to the Excalibur after the cashouts. Bitere was then tracked returning to Room 25-217. A check of registration records revealed that Bitere had checked into that room on December 4, 2017, as the cashouts were ongoing, and that he had also made a reservation for Ciuca to occupy Room 16-240. Bitere was identifiable to detectives as the person who had conducted the cashouts.

A short while later, detectives followed Bitere and Serban as they drove together to a Money Tree cash center in a second vehicle, a Volkswagen Tiguan registered to Bitere. The detectives arrested Bitere and Serban as the two were attempting to wire transfer $1,000 to Romania, the country of origin for all three suspects. Bitere's telephone displayed instructions to wire money to Romania. Serban and Bitere had approximately $4,000 in U.S. currency in their possession. Inside the Tiguan, detectives located a wig and sunglasses.

From these numerous facts, the magistrate judge could reasonably conclude that Ciuca had purchased the Saturn using the fake Greek "Mavromatis Fotis" passport and provided it to Bitere to install ATM skimmers and conduct cashouts. Further, Bitere reserved Room 16-240 for

Ciuca, while he himself stayed at the same hotel, and the Saturn was parked at the Excalibur. Those facts in themselves permitted a reasonable, common sense inference that Ciuca was Bitere's accomplice in the scheme, and was likely to have any fruits or instrumentalities related to the scheme either in his Saturn or in his or Bitere's rooms. It is a fair inference that the United States currency withdrawn from the ATMs would not be left in the Saturn, but would instead be in their hotel rooms. A further reasonable inference would be that instruments for the skimming scheme, such as skimmers, micro camera overlays, and counterfeit cards would have to be assembled, repaired, or connected to computers in their rooms. The warrant established that all three were just visiting from Romania and likely to have all of their possessions in the Saturn or their hotel rooms.

Ciuca and Serban had shared a room together at the Budget Suites using the false Greek passport. Serban was arrested with Bitere while the two were attempting to wire transfer cash proceeds to Romania. Serban and Bitere had a large amount of cash, approximately $4,000 on their persons, which is consistent with Serban, Ciuca's Budget Suites roommate, being actively involved in the skimming scheme. Serban and Bitere were also in possession of a wig and sunglasses, which could serve as an effective disguise for obscuring Serban's identity when driving up to an ATM equipped with surveillance cameras. That Ciuca's female companion, with whom he had shared a room immediately prior to checking into the Excalibur, would be so entrenched in the skimming scheme, contributes additional probable cause that Ciuca's hotel room would possess evidence of the crimes.

There was likewise a reasonable inference that, because Bitere had reserved Room 16-240 for Ciuca, Bitere would himself be keeping fruits or instrumentalities of the crimes in Room 16-240 as well. Bitere had been using the Saturn registered under Ciuca's alias. So there was likewise a reasonable inference that Bitere reserved the room for Ciuca so that he would have a another place to store fruits/instruments of the crime under the name of another person.

This totality of facts clearly permitted numerous reasonable, common sense inferences of a fair probability that Ciuca would have the fruits or instrumentalities of the crimes in his hotel

1   room.  Accordingly, the court finds that the affidavit contains ample probable cause to support the

2   issued search warrant.

3   **B.      Search of the hotel room before the issuance of the warrant**

4          Ciuca and Serban allege that a warrantless search of room 16-240 was conducted between

5   12:05 and 2:30 p.m. on December 5, 2017.  They indicate that the hotel supervisor knocked on

6   the hotel room door, and when Ciuca answered, officers handcuffed him and then started

7   searching his room.  They allege that his passport and cellphones on the nightstand were picked

8   up, that they saw cash inside his wife's suitcase, and commented to Ciuca about the evidence they

9   had found.  Ciuca was then taken to hotel security for several hours.   The government responds

10  that no search occurred until the search warrant was obtained.

11         Detective Jogodka was the LVMPD officer assigned to investigate the bank fraud case,

12  and discovered the facts set forth in the search warrant application.  He testified that he went to

13  the Excalibur hotel and with the assistance of hotel security, who helped him identify the driver of

14  the burgundy Saturn and their associated rooms within the Excalibur, decided to apply for a

15  search warrant for room 16-240, as well as room 25-217 and the burgundy Saturn.  He testified

16  that he prepared the search warrant and affidavit in the offices of hotel security, and did not go to

17  room 16-240 until after he had obtained the search warrant.  He further described the process he

18  used to search the room after he received the search warrant, and said that he began by taking

19  pictures of the room to be searched.  After initial entry pictures were taken, as was his practice in

20  order to memorialize the condition of the room at the beginning of the search, he and other

21  officers conducted the search.  The metadata contained on the photos indicates that the search

22  began at 14:47, that the door to the room was open at that time, and that the suitcase which

23  ultimately contained $32,000 was undisturbed when the search began.  Gov't Exhibits 8, 9.  The

24  photos reveal that later, cash was found in a suitcase bag at 14:57.  Detective Jogodka testified

25  that he was present when it was found by Secret Service Agent Swale, who participated in the

26  search.  Detective Jogodka testified that he did not enter the room until he had the search warrant.

27         Alan Whitty, a security officer at the Excalibur Hotel, testified that he utilized the video

28  monitoring capabilities in the hotel to assist Detective Jogodka to identify the rooms of the

6

individual associated with the burgundy Saturn. He allowed his security office to be used by the detective to draft and apply for the search warrant. According to the report written by Mr. Whitty to memorialize the day's activities, at about 12:39 hours on December 5, 2018, Whitty, accompanied by other security officers and law enforcement officers, knocked on the door of 16-240 to determine whether anyone was present in the room. He did so because Detective Jogodka had told him that 16-240 was the target of the search warrant. Ciuca answered the door and was immediately handcuffed and taken into custody. He was then taken by hotel security officer Briscoe and Detective Garrett to the hotel security office, which was a five to six minute walk from the room. He testified that hotel security officer Cuello was assigned the responsibility of ensuring that no person entered the room during the warrant application process.

Mr. Whitty further testified that at 14:47 hours, he accompanied Detective Jogodka to room 16-240 and, using his passkey, opened the door to allow the execution of the search warrant. He stayed outside as the search was conducted.

On cross examination, Mr. Whitty testified that he thought Detective Jogodka had accompanied him during the first contact with Ciuca at about 12:39, and when Ciuca was arrested, had entered the room to see if anyone was present in the room. He also testified that other members of the task force entered the room when Ciuca was first arrested.

Las Vegas Metropolitan Police Department Detective Thomas Garrett testified that he arrived at the Excalibur Hotel and reported to room 16-240 as ordered by his supervisor. He was present when Excalibur hotel security knocked to determine whether any of its occupants were in the room. Ciuca opened the door, and he was immediately handcuffed and placed in Garrett's custody. Detective Garrett's responsibility was to keep an eye on Ciuca until the search warrant was obtained and executed. Garrett testified that when he arrived, all of the law enforcement personnel were outside of the room.

The hotel security office where Detective Garrett took Ciuca has a video camera recorder, and metadata on that recording shows that Ciuca arrived at about 12:49 p.m. and remained there until about 3:30 p.m. Mr. Whitty's estimate that Ciuca was arrested at about 12:43 p.m. therefore appears to be accurate.

Detective Jogodka testified that the search warrant was telephonically applied for at 14:13 and issued at 14:30, as confirmed by the record affidavit and warrant. Gov't Ex. 1. The metadata on Detective Jogodka's first photograph taken as he initiated the search was 14:47. Mr. Whitty's estimate that the warrant was executed at about 14:47 therefore appears to be accurate.

At the hearing, Ciuca provided no evidence that room 16-240 was searched prior to the approval of the search warrant.[1] Detective Jogodka's photographic evidence, Gov't Ex. 12, and testimony indicates that the suitcase containing the $32,000 was discovered at about 14:57 after the search warrant was obtained.

Defendants argued that the "lock interrogation report" (Gov't Ex 6) indicated that the room had been entered before the warrant was obtained. Mr. Whitty, who said he has been a security officer with the hotel for 13 years, testified that the report is an electronic record of the times when a hotel room door has been opened or closed. Mr. Whitty testified that the lock interrogation reports are frequently inaccurate due to a variety of problems, for example, battery failures and programming errors.

Here, the court gives no weight to the accuracy of the lock interrogation report. According to Mr. Whitty, Ciuca was arrested at about 12:39 p.m. This time is corroborated by the security room video which indicates that Ciuca arrived at 12:49 p.m., and Mr. Whitty said it is a five to six minute walk to hotel security. The lock interrogation report indicates that the door was not opened from 12:05 p.m. until 2:08 p.m., and so the report must be incorrect.

According to Detective Jogodka and Mr. Whitty, the search warrant was executed at about 14:47. This time is corroborated by the metadata on Detective Jogodka's photographs of the room as it was initially entered to execute the search warrant, which was taken at 14:47. On the other hand, the lock interrogation report indicates that the door was opened by Mr. Whitty at 2:08 p.m. But Mr. Whitty testified that the first time he opened the door with his key was when they arrived at the room for the purpose of executing the search warrant. The search warrant was not obtained until 2:30 p.m., so the report time of 2:08 must be incorrect.

---

[1] Neither Serban or Ciuca testified. The court was informed that four subpoenaed witnesses (hotel security officers Cuella, Watkins, Bradford, or Briscoe) were present to testify, but they were not called as witnesses.

8

Because the court therefore gives no weight to the lock interrogation report as an indicator of when the door was opened or closed, the court cannot infer that the government searched room 16-240 prior to the execution of the search warrant. Accordingly, the government has shown the sequence of events in the search of the room, and Ciuca has not provided any credible evidence that a search occurred prior to the warrant being obtained. Ciuca's motion to suppress the evidence seized in room 16-240 because it was searched prior to the issuance of a search warrant is denied.

### C.    Whether Ciuca's statements should be suppressed

In his original motion to suppress, Ciuca moved to suppress statements made while he was in the custody of Detective Garrett in the hotel security office. He argues that his statement "bank fraud," and "I know I made a mistake about my passport" was elicited by Detective Garrett while he was in custody, but he had not received *Miranda* warnings. The government concedes that Ciuca was in custody and had not been advised under *Miranda*, but it responds that Ciuca was not interrogated by Detective Garrett, and that volunteered statements that are not the result of interrogation are admissible.

At the beginning of the hearing, in response to the court's inquiry, these statements were identified by Ciuca's counsel as the statements that were the subject of the suppression motion. Later in the hearing, counsel was not allowed to cross examine Detective Garrett regarding other statements which had not been previously identified for suppression, and counsel properly lodged her objection to this limitation. After the hearing, Ciuca filed a motion to supplement the motion by adding additional statements to be suppressed. The government indicated in response that the only statement which it intended to introduce from the video was Ciuca's statement, "bank fraud?" and that the supplemental motion was therefore moot.[2] Accordingly, because the subsequent statements identified by Ciuca will not be introduced in its case in chief, the remainder of the motion to suppress is moot.

---

[2] The government also noted that, because the video had been produced after it had opposed the motion to suppress, it had stipulated to allow Ciuca additional time to file his reply, until June 6, 2018, which the court approved. (ECF Nos. 111, 116.) In spite of being given this additional time, no additional supplement was filed until September 5, 2018, after the evidentiary hearing.

The obligation to administer *Miranda* warnings attaches once a person is subject to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). Custody turns on whether there is a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). In addition to being in custody, the accused must also be subject to an interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Not every question asked in a custodial setting constitutes interrogation. *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (citing *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)). Interrogation means questioning or "its functional equivalent," including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. 291 at 301. An "incriminating response" is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. *Id.* at 302. Whether the questioning constitutes an interrogation is an objective test that focuses on the perception of the defendant; the officer's subjective intent in asking the questions is relevant, but not determinative. *See, e.g., United States v. LaPierre*, 998 F.2d 1460, fn.6 (9th Cir. 1993); *Innis*, 446 U.S. at 301-02; *Booth*, 669 F.2d at 1238 (finding the test to be an objective one where the subjective intent of police is relevant, but not conclusive). Accordingly, volunteered statements are not barred by the Fifth Amendment. *Miranda*, 384 U.S. at 478.

Here, Detective Garrett specifically told Ciuca that he was not the lead investigator in the case and was not going to talk to him about the case.[3] Ciuca then asked what he was being held for, and Detective Garrett responded, "fraud," and that he would let the other detective talk to him about the offense. About a minute later, Detective Garrett asked Ciuca how long he had been in the United States, and Ciuca responded that he did not want to say anything at that time. A period of silence passed, for one minute and 10 seconds, and then Ciuca, in a questioning voice, said, "bank fraud?" The comment was not in response to any question by Detective Garrett.

---

[3] Government Exhibit 13, 12:53:40. He made this comment several times in the course of the two hours that he held Ciuca in the hotel security room.

1    The court finds that, after reviewing the video recording, the discussion between Ciuca

2    and Detective Garrett was a polite conversation that was not reasonably likely to elicit an

3    incriminating response.  *See Booth*, 669 F.2d at 1238 (degree to which questions are routine or

4    involve matters unrelated to the crime are important factors); *see also Mickey v. Ayers*, 606 F.3d

5    1223, 1235 (9th Cir. 2010) (citing *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006)

6    ("Polite conversation is not the functional equivalent of interrogation.").  Rather, the court

7    characterizes the discussion as a casual conversation that is not the functional equivalent of

8    interrogation.  *See United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984) (superseded by

9    statute on other grounds) ("Incriminating statements made in the course of casual conversation

10   are not products of a custodial interrogation.").  Accordingly, the court finds that Ciuca

11   volunteered the statement, and that Ciuca's Fifth Amendment rights were not violated.

12   Ciuca mentions in his supplemental motion that he was subjected to being in a cold room,

13   and that he was denied a drink of water and use of the restroom.  Ciuca provides no points and

14   authorities or argument that the "bank fraud?" statement was involuntary for any reason.

15   Generously assuming that the claims are true,[4] they do not support the conclusion that the "bank

16   fraud?" statement was involuntary.  Ciuca arrived at the security office at about 12:49, and the

17   "bank fraud?" statement was made a few minutes later, at 12:53 p.m.  According to Ciuca, he

18   asks for water at about 15:11 hours, (ECF No. 168, fn 7) and mentions that the room was cold at

19   about 15:20 hours. Id, at fn 8.   These adverse conditions arise two hours after the "bank fraud?"

20   statement has been made.  These claims provide no basis to support an argument that the

21   statement was involuntary, and the court so finds.

22   **D.    Serban's Joinder to Ciuca's Supplement to Motion to Suppress Statements**

23   After Ciuca filed his supplement to motion to suppress statements, Serban moved to join

24   the motion, although she had not joined the original motion to suppress statements.  The

25   government opposed the joinder, arguing that Serban had no standing to move to suppress

26   Ciuca's statements.  Serban replied that Ciuca's statements were prejudicial to her.  Because

28   _____

[4] The government credibly argues that the claims are not true.

11

Serban provides no points and authorities to support the joinder, and raises arguments regarding prejudice for the first time on reply, the motion for joinder is denied.

### III.    CONCLUSIONS

IT IS THEREFORE RECOMMENDED that defendant Ciuca's motion to suppress evidence (ECF No. 95) be DENIED.

IT IS FURTHER RECOMMENDED that defendant Ciuca's motion to suppress statements (ECF No. 96) be DENIED.

IT IS FURTHER ORDERED that defendant Serban's motion to join Ciuca's supplement to suppress statements (ECF No. 170) is DENIED.

### IV.    NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).


DATED: October 9, 2018


_____
C.W. HOFFMAN, JR.
UNITED STATES MAGISTRATE JUDGE